## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CONSTANCE WATERWORTH, individually, as mother and next friend to CHRIST SAM MESSINO, IV, a minor, and as Special Administrator of the ESTATE OF CHRIST SAM MESSINO, III. | Case No. 17-cv-04990 |
| | Judge Mary M. Rowland |
| Plaintiff, | |
| v. | |
| CITY OF JOLIET, Joliet Police Officer WILLIAM OTIS, individually and in his capacity as a Joliet Police Officer; and Joliet Police Officer VON STEIN individually and in his capacity as a Joliet Police Officer, | |
| Defendants. | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Constance WATERWORTH brings this suit as the administrator of the estate of CHRIST SAM MESSINO, IV, a minor, and as Special Administrator of the ESTATE OF CHRIST SAM MESSINO, III, against Defendants CITY OF JOLIET, and Joliet Police Officers WILLIAM OTIS and VON STEIN. Plaintiff brings this suit under 42 U.S.C. § 1983 for violations of Decedent's Fourth and Fourteenth Amendment rights (false arrest, unlawful detention and excessive force) and for wrongful death under Illinois law. Defendants have moved for summary judgment on all claims. [146]. Defendants have also moved to exclude Plaintiff's expert, Dr. Alderman. [149]. For the reasons stated below, Defendants' motion for summary

1

judgment is granted in part and denied in part and their motion to exclude Dr. Alderman is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier

of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

**BACKGROUND**[1]

**I. July 5, 2015 Incident and Criminal Proceedings**

On the early morning of July 5, 2015, Joliet Police Officers Otis and Stein were on patrol in their squad car, parked at the corner of McDonough and Chicago streets in Joliet, Illinois. Dkt. 147 ¶¶ 7 – 9. While parked near a gas station they observed Christopher Sam Messino III ("Messino") enter an SUV and exit the gas station parking lot, driving south. The officers followed. *Id.* at ¶ 9. While following Messino, the officers' squad car had a functioning video camera that captured all events beginning one minute before emergency lights are activated. *Id.* at ¶ 8.

What happens next is in dispute. Officer Otis believed Messino ran a red light at the intersection of Chicago Street and I-80. *Id.* at ¶ 11. Messino drove through two more green lights, and then the officers activated their lights and sirens. *Id. at* ¶ 15. Relying on the dash cam video, Plaintiff asserts the light was green when Messino's SUV passed through the intersection. *Id.* at ¶ 21. While Officer Otis maintains he saw Messino run a red light, he testified that after reviewing the dash cam footage "the video is not clear" about "the color of the light" when Messino went through it. Dkt. 147, Exh. D, ("Otis Dep.") at 16 – 17. Officer Stein was using the squad car's

---

[1] The facts are taken from Plaintiff's Statement of Facts [165], Defendants' Statement of Facts [147], Plaintiff's Responses to Defendants' Statement of Facts [166], and Defendants' Responses to Plaintiff's Statement of Facts [172].

computer and did not see Messino go through the light. *Id.*; *See also* Dkt. 168, Exh. D ("Stein Dep.") at 24.

It is undisputed that after the officer's activated their lights, Messino pulled into a driveway at 1003. S. Chicago Street. Unbeknownst to the officers, this address was Messino's residence. Dkt. 166 ¶ 13. The officer's parked behind Messino and Officer Stein ran out of the police car, told Messino stay in his SUV and closed the SUV's door, telling Messino he was not free to leave. *Id.* at ¶ 14. Plaintiff contends that Officer Stein slammed the door on Messino's leg even though Messino was retreating. Dkt. 165 ¶¶ 26-28.

Defendants claim that Messino's hands and feet were inside the vehicle, not in the door, and Messino did not yell in pain when the door was closed. Dkt. 147 ¶ 15. Officer Stein's testified that he "forcefully" closed the door. Dkt. 164 at 15; *See* Stein Dep. at 15. The dash cam footage captures this incident, without audio. *Id.* at ¶ 28; *See also* Dkt. 147 ¶ 14 *citing* "Dash Cam Video." Plaintiff claims that days later, when Messino returned from jail, his partner, Constance Waterworth, noticed bruising and swelling on his calf. Dkt. 165 ¶ 29.

What happened next is also in dispute. Officer Stein testified that after Messino exited his vehicle, he told the officers his name and birthday and either admitted "that his license was revoked or [he] did not have a driver's license." *See* Stein Dep. at 33 – 34. The officers then placed Messino in the back of the squad car and checked the LEADS database and learned that Messino's license was revoked. *Id.* at ¶¶ 19-20; *See* Stein Dep. at 33 (Stein testifying that when Officer Otis ran

4

Messino's information through LEADS it "revealed that Messino ha[d] a revoked driver's license which is a felony due to previous convictions."); *See* Otis Dep., p. 89. (Officer Otis testified that he obtained the LEADS database report and placed Messino under arrest approximately thirteen minutes after the stop). Messino was then taken to the Will County Jail. *See* Otis Dep. at 12.

Plaintiff Waterworth was never present during Messino's interaction with the officers. *Id*. at ¶ 22. It is undisputed that Messino was not free to leave from the start of the incident. *Id*. at ¶ 31 and Dkt. 166 ¶ 14. He was placed into the back of the police car and only later, the officers learned he did not have a valid license. Dkt. 164 at ¶ 33. Plaintiff also contends that contrary to Officer Otis' testimony about checking LEADS at the scene, the incident report shows that the search in the LEADS database did not take place until 6:53 a.m. Dkt. 165 ¶ 36 *citing* Dkt. 168, Exh. F (incident report).[2] According to Plaintiff, there is no record of communication between the Officers and dispatch concerning Messino's license. *Id*.

Messino was charged with driving on a suspended or revoked license, operating an uninsured motor vehicle, disobeying a traffic control device and disobeying the police in a complaint signed by Officer Stein. Dkt. 55 ¶ 27. Messino bonded out two days after his arrest. *Id*. at ¶ 39. On April 26, 2016, Messino prevailed on a motion to suppress and the State dismissed the case against him. *Id*. at ¶ 46. Plaintiff claims that during this wait, Messino faced significant financial hardship and stress. *Id*. at

---

[2] The Court notes that the document cited by Plaintiff to establish the defendants did not run the LEADS report until 6:35 a.m. is not the LEADS report but is the incident report that was completed at 6:35 a.m. Dkt. 168, Exh. F. The LEADS report does not appear to indicate a time it was accessed. Dkt. 168, Exh. G.

¶¶ 42, 47. Five days after his criminal proceeding was dismissed, on May 4, 2016 Messino died of a heart attack at age 56. Dkt. 147 ¶ 29. Plaintiff claims that Messino never struggled with high blood pressure or hypertension before the incident and quit smoking six (6) months before his death. Dkt. 165 ¶¶ 55-56. Messino was treated with medication for anxiety at different periods in his life prior to his arrest. Dkt. 147 ¶ 36. It is uncontested that Messino suffered from an elevated cholesterol. *Id.* at ¶ 38. Both parties have presented expert testimony opining about the cause of Messino's death. Defendants have filed a *Daubert* motion to preclude Plaintiff's expert. [149].

## II. Plaintiff's Claims and Procedural History

Plaintiff brought five counts in his third amended complaint [40]: unlawful seizure or detention in violation of the Fourth Amendment (Count I); excessive force by Officers Stein and Otis in violation of the Fourth and Fourteenth Amendments (Count II); and a state law claim of wrongful death under the Illinois Wrongful Death Act (Count VI). Count IV is a *Monell* claim against Joliet that has been bifurcated. [83].

Counts III and IV allege federal malicious prosecution and Count VI states a state law malicious prosecution claim. All malicious prosecution claims were dismissed with prejudice on June 11, 2018 after the Court held the Defendants had probable cause to arrest and that is an absolute defense to malicious prosecution. Dkt. 39 at 4-5. The Court found that because the amended complaint admitted that Messino told the officers he did not possess a valid driver's license, Defendants had probable cause to arrest. *Id.* at 5. The Court determined this also limited the unlawful

6

detention claim in Count I to the time period that Messino was seized *prior* to the Defendants learning Messino did not have a valid license. *Id.* at 8. ("The Court reads Count I to be alleging that the initial stop of Messino (before he admitted not having a driver's license) was an unreasonable seizure.").

## ANALYSIS

### I.    Count I - Unlawful Detention and False Arrest

Plaintiff asserts that Officers Stein and Otis violated the Fourth Amendment by arresting him without probable cause. Defendants respond that they were only required to have a reasonable and articulable suspicion for this traffic stop. In the alternative, Defendants also assert a defense of qualified immunity. Additionally, Plaintiff asks this court to overturn a previous ruling that limited the length of time Plaintiff can seek compensation for his detention. We address each of these arguments in turn.

> 1.  *There are material questions of fact whether the defendant officers had a reasonable suspicion for the stop*

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Defendants argue that because this stop involved a traffic stop, they needed only a "reasonable and articulable suspicion," as opposed to probable cause, that Messino committed a traffic violation.[3] (Dkt. 148 at 6, relying on *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020)).

---

[3] Defendants also assert that the stop meets the higher standard of probable cause. Dkt. 148. Probable cause is not required for traffic stops. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting

7

Defendants are correct that this the standard for a traffic stop. In *United States v. Jackson,* 962 F.3d 353, 357 (7th Cir. 2020), the court upheld a traffic stop based upon an air freshener hanging from the rear-view mirror—a violation of a City ordinance. The Court noted: "The Fourth Amendment permits officers to conduct a traffic stop when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California,* 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)); *United States v. Rodriguez-Escalera*, 884 F.3d 661, 667–68 (7th Cir. 2018) ("To pull a car over for a brief investigatory stop, a police officer must have 'at least [an] articulable and reasonable suspicion' that the particular person stopped is breaking the law."). Thus, reasonable suspicion of a traffic violation provides a sufficient basis to justify a traffic stop.

Defendants then assert that there is no question that the officers had a reasonable articulable suspicion that Messino failed to obey a traffic signal. Dkt. 148 at 6. Plaintiff relies on the dash cam video to argue that there is a question of fact whether or not the Officers had a reasonable suspicion.

We turn to whether the facts, viewed in the light most favorable to Plaintiff, establish that the Officers had reasonable suspicion to initiate a brief investigatory traffic stop. Officer Otis testified that he saw Messino run the red light. Dkt. 148 at

---

*Knowles v. Iowa*, 525 U.S. 113, 117, 119 (1998)) ("Though the defendants argue that Officer Petrus lacked probable cause to stop the vehicle—and the district too assessed whether probable cause existed—a routine traffic stop is 'more analogous to a so-called 'Terry stop' ... than to a formal arrest.'") Because we find there is a genuine issue of material fact as to reasonable suspicion, a lower standard, it follows that there are material questions of fact whether there was probable cause for the stop.

6; Otis Dep. at 16 – 17. Because Messino died before this suit was filed, he provided no testimony. But as reference, the case involves dash cam video. At summary judgment "[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018). Officer Otis testified that the video evidence is inconclusive as to whether Messino ran the right light. Defendants argue that the video, viewed in real time, confirms that there was reasonable suspicion that Messino ran the red light because it is ambiguous. Dkt. 174 at 6-7 ("The very ambiguity in real time establishes reasonable suspicion because ambiguity by its nature means either option could be correct.") Defendants urge this Court to find that anything that is "too close to call definitely" be considered enough for reasonable suspicion to exist. *Id.* at 7. However, when video evidence is unclear, it cannot be the sole basis for granting summary judgment against the nonmovant. *Horton*, 883 F.3d at 944*; see also Hurt v. Wise,* 880 F.3d 831, 840 (7th Cir. 2018) ("Indeed, nothing about video evidence justifies placing it in such a privileged position.").

Whether the officers had reasonable suspicion to stop Messino hinges on a disputed fact. Viewing the evidence, including the video, in the light most favorable to the plaintiff, a reasonable factfinder could conclude that Officer Otis lacked reasonable suspicion to believe Messino committed a traffic violation. As Officer Otis stated in his testimony, the video evidence is not clear in this case. It is clear that when the officers arrive at the light, it is red. However, given the distance between the officers' vehicle and Messino's vehicle, it is not clear that Messino ran the red

light. It is a question for the jury whether the Defendant Officers had a reasonable basis to pull Messino over.

### 2. *Qualified Immunity*

Defendants next assert they are entitled to qualified immunity on the unlawful stop and detention claim. They argue that "[i]f a reasonable police officer in Officer Otis' shoes could have believed there was reasonable suspicion for the stop, that is enough" for qualified immunity. Dkt. 148 at 8. Defendants cite *Abbott v. Sangamon County, Ill.,* 705 F.3d 706 (7th Cir. 2013) to support their assertion that police officers are given an "added layer of protection" to the standard of reasonable suspicion which therefore allows for "reasonable mistakes." *Id.; See also* Dkt. 148 at 7. Plaintiff posits that there is no evidence supporting the contention that there is "arguable probable cause" as required for a qualified immunity defense. *See* Dkt. 164 at 3. The Seventh Circuit has found that when there is a genuine issue of material fact as to whether an officer had reasonable suspicion to perform a traffic stop, qualified immunity is not available.

Reasonableness requires an objective inquiry into all of the circumstances known to the officer at the time that he detained the suspect. In order to stop Messino, the officers must have had a reasonable articulable suspicion that he had committed an offense. The Court has already determined that there are material questions of fact as to whether the officers had reasonable suspicion. When there is "a genuine issue of material fact as to whether [the officer] actually perceived a traffic violation" qualified immunity is not available. *Huff v. Reichert,* 744 F.3d 999, 1004 (7th Cir.

10

2004) (affirming denial of qualified immunity where there was question of fact whether driver committed multiple illegal lane changes); *Ones v. Kuschell*, 21-1742, 2021 WL 5563715 at *3 (7th Cir. Nov. 29, 2021) (qualified immunity not available when "there is a genuine dispute of fact over whether the [plaintiff] was complying with [the officer's] orders.")

The Court finds issues of material fact in whether the officers had a reasonable suspicion that Messino violated the traffic light. As we must in summary judgment cases, we view the facts in the light most favorable to the nonmovant. A rational trier of fact could conclude that Messino did not commit a traffic violation. Therefore, these disputed facts also preclude granting qualified immunity.

*3. Reconsideration of Previous Rulings*

Lastly, Plaintiff asks this court to reconsider Judge Alonzo's ruling that there was probable cause for the arrest and thereby expand the unlawful detention claim to the stop, arrest and two-day detention of Messino. Dkt. 164 at 6. We decline to do so. Plaintiff's Third Amended Complaint specifically stated "[Messino] responded to inquiries by Defendant Officers, providing them with his name and date of birth after stating that he was not in possession *of a valid driver's license.*" Dkt. 40 ¶ 25 (emphasis added). Plaintiff now claims that Messino only admitted to not possessing a license at that moment. Dkt. 164 at 7.

Statements in the complaint are binding. *Jackson v. Marion Cty.*, 66 F.3d 151, 153 (7th Cir. 1995) ("Allegations in a complaint are binding admissions."). Therefore, it is unnecessary to consider what time Officer Otis retrieved information from the

LEADS database. Even if it was hours later, the officers had probable cause to arrest Messino when he told them that he did not possess a *valid* license. The Supreme Court has held that an earlier decision should only be revisited when the initial decision was "clearly erroneous" and "would work a manifest injustice.*" Christianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 817 (1988). Given Plaintiff's pleadings, Judge Alonzo's ruling on the motion to dismiss was not erroneous. The Court declines to extend the timeframe of the incident at issue. The claim for a Fourth Amendment unlawful seizure ends when Messino admitted he did not have a valid license—at the most thirteen minutes.

## II.      Count II - Excessive Force Claim

Defendants move for summary judgment on Plaintiff's excessive force claim, arguing the record fails to raise a triable issue of fact as to the force used. Dkt. 148 at 8. Plaintiff claims there is clear video evidence and deposition testimony establishing the use of excessive force during the stop and that the dash cam "video depicts Officer Stein running up to Decedent's vehicle and slamming the truck door on Decedent's leg, causing severe injuries." Dkt. 164 at 16. Defendants' assert that the video clearly shows Messino's leg was not injured during the stop.

At the onset, "[a]n officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest." *Williams v. Brooks,* 809 F.3d 936, 944 (7th Cir. 2016). Under prevailing Supreme Court precedent, "all claims that law enforcement officers have used excessive force— deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free

citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989). To prevail, Waterworth must show that the force used on Messino was not objectively reasonable in light of the facts and circumstances confronting the officers. *Id.* at 497; *See also Dawson v. Brown,* 803 F.3d 829, 833 (7th Cir. 2015). Courts analyzing excessive force claims should consider:

> the severity of crime; whether the suspect posed an immediate threat to the officers or others; whether the suspect was resisting or evading arrest; whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duties.

*Id.* Courts "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983)). "An officer's use of force is unreasonable from a constitutional point of view only if, judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009) (internal quotation marks omitted).

Generally, excessive force cases are a matter of disputed facts. *Graham*, 490 U.S. at 396. However, when there "are sufficient material facts to establish the officer acted reasonably under the circumstances, the court must resolve the issue as a matter of law, rather than allow a jury to 'second-guess' the officer's action." *Dawson,* 803 F.3d at 833.

13

Here, the excessive force claim is narrowly defined to the moment Officer Stein shuts the door as Messino attempts to exit the vehicle. Plaintiff does not allege that excessive force occurred at any other time of the traffic stop or arrest. *See* Dkt. 40 at 21, ¶ 33; *See also* Dkt. 164 at 15. Both sides agree that the video evidence from the squad car is an accurate representation of what occurred, though they differ on what it depicts. Dkt. 148 at 8; Dkt. 164 at 15. Plaintiff also relies on Officer Stein's deposition testimony that he "forcefully" closed the door to support her claim. Dkt. 164 at 15; *See* Stein Dep. at 15. Plaintiff testified that Messino's leg was bruised from the incident. Dkt. 165 ¶ 29.

It is uncontested that at the time of the stop, Officers Stein and Otis were not aware that Messino had stopped in front of his home and had reason to believe he was attempting to flee by opening the door. Dkt. 166 ¶ 13; *See also* Stein Dep. at 15-16. Video evidence shows Officer Stein running around the back of the vehicle to the driver's door, and before Messino steps out of his vehicle, Officer Stein forcefully closes the door. *See* Dash Cam Video at 3:58:10. There is nothing on the video that supports a finding that Officer Stein used excessive force. It does not appear on the video that the car door touches Messino's leg. Shortly thereafter, the video shows Messino outside the vehicle walking around without any apparent injury to his leg or ankle. *Id.* at 3:59:08. *Horton*, 883 F.3d at 944 ("[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it."). In sum, there is nothing in the dash cam footage to support the contention that the vehicle door made contact with Messino's leg. Ms. Waterworth's deposition that Messino's leg was bruised does not

mean that his leg was hit with the car door—as opposed to being injured some other way. In addition, if the door did make contact with Messino's leg, the video establishes this was not excessive force but reasonable force. Courts remain cognizant of "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Williams,* 809 F.3d at 944. Under the totality of the circumstances, it was reasonable for Officer Stein to quickly move around the car and shut the door to prevent Messino from exiting before gathering more information. Officer Stein's testimony that he closed the door "forcefully" is not sufficient to create a genuine issue of material fact.

Having failed to establish a genuine issue of material fact, Plaintiff cannot succeed on her excessive force claim. The Court grants summary judgment on Count II in favor of Defendants.

## III.    Count V - Wrongful Death Act Claim

Plaintiff also brings a state law claim under the Illinois Wrongful Death Act, 740 ILCS 180 ("WDA") asserting that the Officers' willful and wanton conduct was the proximate cause of Messino's death. Plaintiff asserts that his WDA claim is distinct from the federal claims brought in this suit, and even if the §1983 claims are dismissed, the WDA claim stands as an independent cause of action. Dkt. 164 at 10. To establish a WDA claim, plaintiff must show that "the defendant owed a duty to the decedent, that the defendant breached that duty, that the breach of duty proximately caused the decedent's death, and that pecuniary damages occurred to

15

persons designated under the Act." *Harris v. Wexford Health Sources, Inc.*, 2017 WL 4467480 at *5 (N.D. Ill. Oct. 6, 2017). Defendants make three arguments in response. First, Defendants contend that the WDA is not an independent cause of action, but rather requires an underlying state tort claim. Second, Defendants assert that this Court's earlier finding that the officers had probable cause to arrest moots this claim. Third, Defendants claim that there is no evidence the remaining claim of unlawful detention of thirteen minutes proximately caused Messino's death. We address each of these arguments, and Plaintiff's response, in turn.

As a preliminary matter, both state and federal precedent is clear that the Illinois Wrongful Death Act is an independent cause of action. *See Turner v. Cook County Sheriff's Office by & through Dart,* 19 CV 5441, 2020 WL 1166186 (N.D. Ill. Mar. 11, 2020) ("The Wrongful Death Act 'independently create[s] a statutory cause of action…'"); *Harris,* 2017 WL 4467480 at *5 ("The Illinois Wrongful Death Act, 740 ILCS 180/1 et seq., provides an independent cause of action for damages arising from a decedent's death caused by a wrongful act, neglect, or default."). However, WDA claims are generally analyzed alongside Fourth Amendment claims when brought in the same suit and alleging similar facts. *Gilbert v. City of Chicago*, 404 F. Supp. 3d 1215, 1222 (N.D. Ill. 2019). "[T]he two are closely related, and a finding of reasonableness under the Fourth Amendment standard usually results in a finding that willful and wanton conduct did not occur [for purposes of the WDA claim]." *Id. citing Muhammed v. City of Chicago,* 316 F.3d 680, 683 (7th Cir. 2002) (same rule regarding use of force applies in both Fourth Amendment and Illinois Wrongful Death

Act). In essence, a defendant can only be held liable under the WDA "if that party would have been liable for the injuries if there was no death." *Turner,* 2020 WL 1166186 at *8. So Plaintiff's wrongful death claim only survives summary judgment if, in considering the facts most favorable to the plaintiff, her surviving underlying claim—a thirteen-minute unlawful detention—involved willful and wonton conduct that could have caused Messino's death.

Plaintiff instead focuses on her malicious prosecution claim. That is also the focus of Plaintiff's expert, Dr. James Alderman's opinion. Dkt 168-13 at 1. ("It is my opinion that the emotional mental stress (stress) that Christopher endured by virtue of his arrest, including the loss of his job, the loss of housing, and the criminal justice process, more likely than not, caused the cardiac event that, more likely than not, was a myocardial infarction, resulting in sudden death. Stress was, at a minimum, a cause of Christopher's death.")

The problem for Plaintiff is that the defendant officers cannot be held liable under the WDA because the officers had probable cause to arrest Messino once he told them he did not have a valid driver's license. That means they have no liability for the "stress" Plaintiff's expert relies on: delays in trial, misleading statements made at trial and the overall stress of a criminal prosecution as a cause for Messino's death. Given Judge Alonzo's correct ruling that a malicious prosecution claim is not viable because there was probable cause for the arrest, it follows that Plaintiff will not be able to adequately prove the elements of the tort under the WDA. *See* Dkt. 39 at 6 ("Although the initial stop of Messino is alleged to be unlawful, it is specifically

17

alleged by plaintiff that Messino told the Officers he did not have a valid license. Messino's admission gave the Officers probable cause to arrest Messino, which means the Officers have an absolute defense to plaintiff's claims for false arrest, unlawful detention and malicious prosecution stemming from that arrest.").

In response, Plaintiff asserts that even a thirteen-minute detention could present as a proximate cause for Messino's death. Dkt. 164 at 13. This theory faces multiple hurdles but the most obvious one is that because Plaintiff's expert only opines about the stress caused by the entire criminal proceedings, there is *no* evidence in the record that a thirteen-minute detention could lead to Messino's death almost eleven months later. While questions of fact in WDA claims are generally left for a jury, "this question is one that can [be] resolved at summary judgment if 'all evidence, when viewed in the aspect most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary determination based on that evidence could ever stand.'" *Gilbert,* 404 F. Supp 3d at 1223, *quoting Carter v. Chicago Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998). There is no evidence to support a claim under the WDA. Summary judgment is appropriate.

Lastly, because Plaintiff's WDA claim does not survive, Dr. James Alderman does not provide any relevant testimony. *See Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 819 (7th Cir. 2014) ("Expert testimony is inadmissible if it is not helpful to the trier of fact, because it would not have 'aid[ed] the jury in resolving a factual dispute.'") (citation omitted). Defendants' *Daubert* motion is granted.

## CONCLUSION

For the stated reasons, Defendants' motion for summary judgment [146] is denied in part and granted in part. The Court grants summary judgment to Defendants on Count II and V of Plaintiff's amended complaint but Count I, as narrowed, remains. Plaintiff's *Monell* claim (Count IV) alleging false report writing is dismissed without prejudice. Defendants' *Daubert* motion [149] is granted.

E N T E R:

Dated: December 21, 2021

_____
MARY M. ROWLAND
United States District Judge